# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA
AND THE STATE OF MICHIGAN
ex rel. STACY GOLDSHOLL, M.D.,
and STACY GODSHOLL, M.D.,
individually,

                   Plaintiffs,

vs.

COVENANT HEALTHCARE
SYSTEM, a Domestic Nonprofit
Corporation, and COVENANT
MEDICAL CENTER, a Domestic
Nonprofit Corporation, and MARK
ADAMS, M.D., an individual,

                   Defendants.

Civil Action No. 12-15422
HON. THOMAS L. LUDINGTON

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. §3730(b)(2)**

**FILED UNDER SEAL
DO NOT PLACE IN PRESS BOX
DO NOT ENTER ON PACER**

**JURY TRIAL DEMANDED**

## COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT
## (31 U.S.C. §§3729 *et seq.*), MICHIGAN MEDICAID FALSE CLAIMS
## ACT (M.C.L. §§400.601 *et seq.*), ANTI-KIKCBACK STATUTE (42 U.S.C. §
## 1320a-7b(b) *et seq.*) AND THE STARK ACT (42 U.S.C. § 1395nn *et seq.*)

## <u>TRIAL BY JURY REQUESTED</u>

Qui Tam relator, Stacy Goldsholl, M.D., ("Relator" or "Plaintiff"), by her

attorneys, on behalf of the United States of America, files this complaint against

Defendants—Covenant Healthcare System and Covenant Medical Center (referred

to collectively as "Covenant") and Mark Adams, M.D.—to recover damages,

penalties, and attorneys' fees for violations of the Federal False Claims Act

("FCA"), 31 U.S.C. §§ 3729 *et seq.*- 3730(h); the Stark Act, 42 U.S.C § 1395nn,

*et. seq.*; the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b); and the

Michigan Medicaid False Claim Act ("MFCA"), MCL 400.601, *et seq.*

## INTRODUCTION

1.      Covenant violated the FCA, the AKS, the Stark Act, and the MFCA on

seven counts. Broadly, (1) Defendant provides medical directorships to top

referral source, compensating the directors beyond fair market value for the

labor provided; (2) Defendant offers free services to physicians as a form of

remuneration and inducement for referrals; (3) Defendant provides perks—

conveyed via excessive overhead costs and other contracted benefits,

unenforced contracts, and unwritten agreements—in order to reward and

induce referrals; (4) Defendant participates in a scheme to capture funding

from Medicare and Medicaid in order to create secret bonuses for high

referral sources as remuneration; and (5) Defendant knowingly submits

Medicare and Medicaid claims for services that do not meet regulatory

requirements.

2.      Mark Adams, M.D., violated the FCA, MFCA, AKS, and Stark Act. Adams

knowingly solicited and accepted bribes, including excessive compensation

and free management services. In exchange, Adams referred patients to Covenant.

3.  Relator observed and openly challenged Covenant's and Mark Adams' violations, hoping to stop all fraudulent activity.

4.  Both Defendants persisted with their fraudulent activity in violation of the FCA, MFCA, AKS, and Stark Act.

5.  Covenant subsequently terminated Relator.

6.  Relator initially filed a Complaint on December 10, 2012, pursuant to 31 U.S.C. § 3730(b)(2), aiming to expose and rectify both defendants' fraudulent activity.

    Relator now files this First Amended Complaint, alleging additional violations of the FCA, AKS, and Stark Act. Also Relator makes a new claim that Covenant violated the MFCA. Finally, in this First Amended Complaint, Relator now names individual physician, Mark Adams, M.D., as a Defendant.

## **<u>JURISDICTION AND VENUE</u>**

7.  This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

8.    This Court has personal jurisdiction over all Defendants, pursuant to 31

       U.S.C. § 3732(a) because both Defendants are located in this District and

       regularly conduct business in this District.

9.    Venue is proper in this District pursuant to 31 U.S.C. § 3731(a) and under 28

       U.S.C.

       § 1391(b) because both Defendants conduct business in this district.

10.   Relator knows of no other complaints that have been filed against either

       Defendant, which alleges the same or similar allegations.

11.   Relator is an original source as defined by the FCA, 31 U.S.C. §

       3730(e)(4)(B).

## FILING UNDER SEAL

12.   Pursuant to 31 U.S.C. § 3730(b)(2), this Complaint must be filed *in camera*

       and under seal, without service on the Defendant. The complaint remains

       under seal while the Government conducts an investigation of the allegations

       in the complaint and determines whether to join the action.

13.   As required by both False Claims Acts, Relator has served a copy of the

       Amended Complaint and a written disclosure of substantially all material

       evidence and information in her possession to the United States Attorney

       General, the United States Attorneys' Office for Eastern District of

       Michigan and the Attorney General.

## THE PARTIES

### A.   Relator

14.  Relator is a citizen of the United States and a resident of the state of
Michigan and the state of North Carolina.

15.  Relator is a Board-Certified Internal Medicine Physician and holds an
Executive Master in Business Administration.

16.  Relator has personal knowledge that Covenant offered inducements and
remuneration in exchange for referrals, that Covenant filed Medicaid and
Medicare claims for procedures predicated on induced and rewarded
referrals, and that Covenant knowingly filed fraudulent claims that did not
comply with CMS guidelines.

17.  Relator also has personal knowledge that Mark Adams accepted
remuneration and inducements in exchange for referring patients to
Covenant.

18.  Relator discovered these violations during her employment with Covenant.

19.  Relator worked for Covenant for approximately five years.

20.  First, from July 2002 to April 2005, Relator served as Medical Director of
Covenant HealthCare's Hospital Medicine Program.

21.   Later, Spencer Maidlow, Covenant's then-CEO, and John Kosanovich, then-Vice President of Medical Affairs, recruited Relator to return to Covenant and to organize Covenant-employed physicians into a medical group.

22.   Relator returned to Covenant and served as the Executive Director and Chief Medical Officer of Covenant Medical Group from August 2010 until October 2012. In October 2012, Covenant promoted Relator to Vice President of Covenant HealthCare and CEO of Covenant Medical Group.

23.   Relator became aware of Defendants' fraudulent activity through the scope of her employment, which regularly dealt with compliance, recruitment of physicians and mid-levels (such as nurse practitioners and physician's assistants), contracts, and compensation.

24.   Additionally, John Kosanovich tasked Relator with monitoring "referral leakage."

25.   At Kosanovich's instruction, Relator led a Leakage Task Force, which tracked Covenant-employed physicians' referrals.

26.   The task force relied on information from built-in reports from Epic, an Electronic Medical Records ("EMR") software, and information Crimson Market Advantage, an Advisory Board Company that provides data on healthcare markets and referrals.

27.   Executives used information from the task force to direct referrals to Covenant. This experience, as well as others, emphasized Covenant's fixation on referral traffic.

28.   Overtime, Relator observed irregularities. She noticed that executives offered unusually favorable contract provisions and had unwritten agreements with physicians.

29.   At the same time, physicians and administrators approached her, expressing concerns about compliance and quality of care. One physician's anonymous feedback even complained, "Covenant Healthcare's executive team is clearly putting profits and market shares before quality of patient care."

30.   Relator faced hostility when she raised her concerns about compliance and quality of care to Covenant executives.

31.   Nonetheless, Relator attempted to correct the problems she identified.

32.   Covenant's executives, such as Edward Bruff, Covenant's then COO and current CEO, became angry that Relator was causing trouble, while others warned her that she was treading on dangerous ground. For example, Spencer Maidlow's Executive Assistant, Marla Hanks, warned relator, "Be very careful, Stacy, he [Ed Bruff] will cut you out."

33.   In early 2012, Covenant promoted Relator to Vice President of Covenant HealthCare and CEO of Covenant Medical Group.

34.   Ed Bruff directly supervised Relator in this role, and Relator deduced that

Bruff aimed to silence her.

35.   She began to fear she would soon be terminated. Still, Relator continued to

investigate irregularities and voice her concerns.

36.   Relator's suspicions proved true, and in October 2012 Ed Bruff terminated

Relator's employment.

### B.    **Defendants**

37.   Covenant HealthCare System and Covenant Medical Center are domestic

not-for-profit companies, operating in the central Michigan region.

38.   Covenant offers comprehensive healthcare services for patients and houses

over 623 acute care beds.

39.   Covenant was incorporated in 1997 with a registered office in Saginaw, MI.

40.   Covenant is one of the largest health systems in Michigan with a hospital in

Saginaw, offices in Saginaw, Bay Center, Midland, and Frankenmuth, and

outpatient facilities throughout Mid-Michigan.

41.   Relator frequently refers to Covenant's executive team in this Complaint.

This executive team includes the following executives:

- Spencer Maidlow, the CEO of Covenant until his retirement in
  December 2014

- Edward Bruff, the former COO and current CEO as of December
  2014

- John Kosanovich, the former Vice President of Medical Affairs who took over Relator's job after her termination

- Dave Nall, the Director of Practice Management

- Dan George, President of the Covenant HealthCare Partners ("PHO") and Vice President of Ambulatory Planning who oversaw Covenant's cardiologists and oncologists

- Mike Slavin, the Medical Director of the PHO

- Mark Gronda, former Chief Financial Officer and CEO of the PHO

42.   Defendant, Mark Adams, M.D., is a neurosurgeon practicing in Saginaw, MI, and Midland, MI.

43.   Adams formerly was a Covenant-employed physician, but now is in private practice with MidMichigan Medical.

## APPLICABLE FEDERAL LAWS AND REGULATIONS
### A.     The False Claims Act

44.   Under the FCA, 31 U.S.C. § 3729(a)(1)(A), it is a violation of federal law to knowingly present or cause to be presented a fraudulent claim to the United States. For every violation, the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of $5500 to $11,000 per claim for claims made on or after September 29, 1999.

45.   The FCA, 31 U.S.C. § 3729(a)(1)(B), makes it a violation of federal law to knowingly make, use, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the

Government. The United States may recover three times the amount of the damages that the government sustains and a civil monetary penalty of $5,500 to $11,000 per claim for claims made on or after September 29, 1999.

46.   Under FCA, 31 U.S.C. § 3729(a)(1)(C), prohibits conspiring to commit a violation of the FCA, liable for three times the amount of the damages the Government sustains and a civil monetary penalty between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

47.   The FCA, 31 U.S.C. § 3729(a)(1)(G), makes it a violation of federal law to knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government. It further makes it a violation of federal law to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government.

48.   The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property, which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or

other recipient for any portion of the money or property which is requested,
31 U.S.C. § 3729(b)(2).

49.     The FCA, 31 U.S.C. § 3729(b)(1) provides that "'knowing' and
'knowingly'—(A) mean that a person, with respect to information—(i) has
actual knowledge of the information; (ii) acts in deliberate ignorance of the
truth or falsity of the information; or (iii) acts in reckless disregard of the
truth or falsity of the information; and (B) require no proof of specific intent
to defraud."

50.     The FCA, 31 U.S.C. § 3729(b)(4) provides that "material" means having a
natural tendency to influence, or be capable of influencing, the payment or
receipt of money or property." A violation of the Anti-Kickback Statute or
the Stark Act renders resulting claims to Medicare false or fraudulent in
violation of the FCA. Moreover, the Patient Protection and Affordable Care
Act, Publ. L. No. 111-148, 124 Sta. 119 § 6402(f)(1) (2010), described *infra*,
makes clear violations of the AKS or the Stark Act give rise to liability
under the FCA.

51.     This Complaint should be deemed to include violations of the FCA prior to
the Fraud Enforcement and Recovery Act ("FERA"), which covers
Defendant's violations on or before May 20, 2009, when Congress amended
and renumbered the FCA pursuant to FERA

## B.     The Anti-Kickback Statute

52.   The Medicare and Medicaid Patient Protection Act, also known as the AKS,

or the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of

congressional concern that the remuneration and gifts given to those who

can influence health care decisions corrupts medical decision-making and

can result in the provision of goods and services that are more expensive

and/or medically unnecessary or even harmful to a vulnerable patient

population. To protect the integrity of the federal healthcare programs,

Congress enacted a prohibition against the payment of kickbacks in any

form. The AKS was enacted in 1972 "to provide penalties for certain

practices which have long been regarded by professional organizations as

unethical, as well as unlawful… and which contribute appreciably to the cost

of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong.,

1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

53.   In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving

or paying "any remuneration to induce referrals and increased the crime's

severity from a misdemeanor to a felony with a penalty of $25,000 and/or

five years in jail." *See* Social Security Amendment of 1972, P.L. No. 92-

603, 241(b) and (c); 42 U.S.C. § 1320a-7b. In doing so, Congress noted that

the purpose of the AKS was to combat fraud and abuse in medical settings

that "cheats taxpayers who must ultimately bear the financial burden of

misuse of funds...diverts from those most in need, the nation's elderly and

poor, scarce program dollars that were intended to provide needed quality

health services…[and] erodes the financial stability of those state and local

governments whose budgets are already overextended and who must commit

an ever-increasing portion of their financial resources to fulfill the

obligations of their medical assistance programs." H.R. Rep. No. 95-393, pt.

2, at 37, reprinted 1977 U.S.C.C.A.N. 3039, 3047.

54.   In 1987, Congress again strengthened the AKS to ensure that kickbacks

masquerading as legitimate transactions did not evade its reach. See

Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142,

Medicare and Medicaid Patient and Program Protection act of 1987, Pub. L.

No. 100-93.

55.   The AKS prohibits any person or entity from knowingly and willfully

offering to pay or paying any remuneration to another person to induce that

person to purchase, order, or recommend any good or item for which

payment may be made in whole or in part by a federal health care program,

which includes any state health program or health program funded in part by

the federal government. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

56.   The statute provides, in pertinent part:

(b) Illegal remunerations

\* \* \*

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to include such a person--

(A)    To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal healthcare program, or

(B)    To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

57.    A recipient of remuneration is also liable under the AKS, 42 U.S.C. § 1320a-7(b)(1), if he or she:

knowingly and willfully, solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal healthcare program.

58.    In addition to criminal penalties, a violation of the AKS can also subject the

perpetrator to exclusion from participation in federal health care programs

(42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per

violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of

remuneration paid, regardless of whether any part of the remuneration is for

a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

59.   Accordingly, under the AKS, healthcare systems, such as Covenant, may not offer or pay any remuneration, in cash or in kind, directly or indirectly, to induce physicians to refer patients for services or procedures that may be paid for by a federally-funded healthcare program such as Medicare. Likewise, the AKS prohibits physicians, like Defendant, Mark Adams, M.D., from soliciting or receiving any remuneration in return for referrals.

60.   The AKS not only prohibits outright bribes, but also prohibits any payment or other remuneration by a healthcare system in a physician or other person which has, as one of its purposes, the inducement of the physician to influence or recommend the healthcare system.

61.   Pursuant to the Patient Protection and Affordable Care Act, Publ. L. No. 111-148, 124 Stat. 119 § 6402(f)(1) (2010) ("PPACA"), which became law on March 23, 2010, claims for items or services billed to government-funded healthcare programs, including Medicare, "resulting from" a violation of the AKS are "false or fraudulent claims" under the FCA.

62.   The PPACA also clarified the intent requirement for the AKS, and now provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation." Accordingly, proof that a defendant knew of and specifically intended to violate the AKS is no longer required, instead proof

that the defendant intended to perform the actions that violated the AKS gives rise to a violation.

63.  At all times relevant to this Complaint, compliance with the AKS has been a condition of participation for a health care provider under Medicare, Medicaid, and other federally-funded healthcare programs. Moreover, compliance with the AKS is a condition of payment for claims.

64.  For example, under 42 U.S.C. § 1395y(a)(1)(A), "nonpayment may be made [under the Medicare statute] for any expense incurred for items or services which. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."

65.  Kickbacks are, by definition, not "reasonable and necessary for the diagnosis or treatment of illness or injury."

66.  As set forth below, Covenant has regularly provided kickbacks in cash and kind to many physicians to induce referrals. Likewise, Defendant Mark Adams has solicited and accepted such kickbacks in exchange for referring patients to Covenant.

67.  By definition, pursuant to the PPACA and firmly established law prior to the clarification set forth therein, Covenant's and Adams' violations of the AKS rendered all claims, which were for services provided pursuant to a referral tainted by a kickback, as false, as defined by the FCA.

68.   Thus, Covenant and Adams are liable for causing the submission of these

false claims.

69.   Additionally, certain providers, such as hospitals, participating in federal

healthcare programs must annually certify compliance with the AKS. This

certification is included in CMS Form 2552 cost report, which providers

submit each year. The federal Medicare program and the state Medicaid

programs rely upon this certification in making payments to such providers.

The "advisory" language preceding the certification section read as follows:

Misrepresentation or falsification of any information contained in this cost
report may be punishable by imprisonment under federal law. Furthermore,
**if services identified by this report were provided or procured through
the payment directly or indirectly of a kickback** or were otherwise illegal,
criminal, civil and administrative action fines, and/or imprisonment may
result.

(Emphasis added).

The specific certification language reads:

Certification by officer or administrator or provider(s)

I hereby certify that I have read the above statement and that I have
examined the accompanying electronically filed or manually submitted cost
report and the Balance Sheet and Statement of Revenue and expenses,
prepared by [Provider(s) Names and Number(s)] for the cost reporting
period beginning [date] and ending [date] and that to the best of my
knowledge and belief it is a true, correct and complete statement prepared
from the books and records of the provider in accordance with applicable
instructions, except as noted. **I further certify that I am familiar with the
laws and regulations regarding the provision of health care services and
that the services identified in this cost report were provided in
compliance with such laws and regulations.**

(Emphasis added)

70.  Payment to providers under federal healthcare programs--not just participation in those programs--is conditioned upon this express certification that the provider has complied with the AKS. Providers' suppliers are also bound by the rules and regulations underlying the AKS. See 42 C.F.R. § 1001.952(h)(2). thus the CMS Form 2552 cost reports submitted to Medicare and Medicaid programs by any provider receiving kickbacks from Defendant, like Defendant Mark Adams, were false for purposes of the FCA because they contained a false certification of AKS compliance.

71.  Although the AKS provides certain safe harbors, none of Covenant's or Adams' violations met the constraints of regulatory safe harbors.

### C. The Stark Act—The Medicare/Medicaid Self-Referral Statute

72.  The Medicare/Medicaid Self-Referral Statute, 42 U.S.C § 1395nn, *et. seq.*, known as the "Stark Act," prohibits a physician from making a referral that will lead to a claim being submitted for "designated health services," where the referring physician has a nonexempt "financial relationship" with the healthcare provider who will provide the referred services. 42 U.S.C. § 1395nn(a)(1), (h)(6).

73. The Stark Act provides that healthcare providers shall not cause to be presented a Medicare or Medicaid claim for such services.

74. Stark also prohibits payments of claims rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(1), (g)(1).

75. Although Stark sets out exceptions that protect healthcare providers from liability, neither Covenant nor Adams qualify for such exceptions.

## D.   The Michigan Medicaid False Claim Act

76. MCL 400.601, *et seq*., known as the Michigan Medicaid False Claim Act ("MFCA"), models the Federal False Claims Act described *supra*.

77. Under, MCL 400.604, it is a violation to solicit, offer, or receive a kickback or bribe in connection with a furnished service, for which payment is made in whole or in part pursuant to state Medicaid. Furthermore, MFCA makes it a violation to receive make or receive a payment or receive a rebate of a fee or charge for referring an individual to another person is punishable by imprisonment for not more than 4 years, or by a fine of not more than $30,000, or both.

78. MCLA 400.606 makes it a violation to agree or conspire to defraud the state by obtaining, or helping another to obtain, a payment of false claim. Those who violate this provision are punishable by imprisonment for not more than 10 years, a fine of not more than $50,0000, or both.

79.   MCLA 400.607 makes it a violation to present or cause to be presented a false claim to a state employee or officer, where that claim falsely represents that service or goods were medically necessary in accordance with professionally accepted standards. Every such claim is a separate offense. Moreover, it is a violation to make, use, or cause to be made or used a false record or statement in order to conceal, avoid, or decrease an obligation to pay money to the state pertaining to a claim. Violations of MCLA 400.607 is punishable by imprisonment for not more than 4 years, a fine of not more $50,000, or both.

80.   MCLA 400.602(f) defines knowing as being "in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a Medicaid benefit." MFCA also covers "acting in deliberate ignorance of the truth or falsity of facts or acting in reckless disregard of the truth or falsity of facts." MFCA does not require proof of specific intent to defraud.

## FACTUAL ALLEGATIONS

**A.   Defendant provides medical directorships to top referral sources, compensating the directors beyond fair market value for the services they provide.**

**Kimiko Sugimoto, M.D.**

81.   Covenant awarded Kimiko Sugimoto, M.D., a position as an Assistant
Trauma Medicine Director.

82.   Although Sugimoto received $80,000 annually for her directorship,
Covenant did not expect Sugimoto to satisfy the responsibilities of a
director.

83.   Covenant did not require Sugimoto to document any hours to demonstrate
that she had performed her duties as a medical director.

84.   Defendant kept no logs and provided no oversight to verify that Sugimoto's
performance merited $80,000 in annual compensation.

85.   Moreover, at least two Covenant employees noted that Sugimoto lacked the
requisite experience to serve as a director.

86.   Covenant offered Sugimoto this directorship in order to secure surgical
referrals through the practice Sugimoto worked for MidMichigan Surgical
Specialists.

**Thomas Damuth, M.D.**

87.   Covenant awarded Thomas Damuth, M.D., a position as the Medical
Director of Critical Care and Respiratory Therapy. At that time, Damuth was
in private practice with Northeast Pulmonary Associates.

88.   Damuth received high compensation but did not have to fulfill the full,
normal responsibilities of a director.

89.   Although Damuth did work on some Intensive Care Unit initiatives, he did not satisfy the hourly requirements of a director.

90.   Moreover, Defendant did not supervise Damuth's work or require him to log hours that would verify that he completed his duties; nor did Covenant adopt a fair market approach when determining how to compensate Damuth.

91.   The Critical Care nursing staff complained to Relator that Damuth was unresponsive to their concerns about the department, relaying that Damuth did not attend to his responsibilities as director.

92.   Covenant offered Damuth the directorship in exchange for Damuth agreeing to switch his referrals to Covenant. Defendant formerly referred his patients to St. Mary's Hospital, a Covenant competitor.

93.   When Damuth switched his referrals exclusively to Covenant, Defendant benefitted from a new, high-volume stream of referrals.

**B.**   **Defendant offers free services to physicians as a form of remuneration and inducement for referrals.**

### Steven Jensen, M.D.

94.   Steven Jensen, M.D., is a private physician with Tricity Urology; he regularly refers a high number of patients to Covenant.

95.   Covenant hoped to keep Jensen as a satisfied referral source, so it rewarded Jensen with free services from a Covenant-employed physician assistant.

96.    Jensen was significantly behind in his chart documentation duties.

97.    Jensen frequently performed procedures in Covenant facilities, but Covenant could not bill insurance providers, such as Medicare and Medicaid, for facility fees because Jensen did not complete his surgical notes. With these surgical notes, Covenant could not apply the appropriate coding to bill insurance providers.

98.    The Covenant-employed physician assistant completed Jensen's surgical notes, making up for the backlog.

99.    Covenant did not charge Jensen for these administrative services.

100.   Problematically, the physician assistant was not present for the procedures for which he supplied notes; nonetheless, Covenant relied on the physician assistant's surgical notes to bill Medicare and Medicaid.

101.    Although CMS prohibits billing for services based on notes authored by someone not present for those services, Covenant nonetheless submitted Medicare and Medicaid claims for these procedures.

102.   This allowed Jensen to save time, while Covenant billed for approximately $5 million in facility fees.

103.   Covenant also provided Defendant Jensen free recruitment services and resources when he recruited a new physician, Karla Witzke, D.O., to his private practice.

104.   Relator specifically asked Dave Nall to create a recruitment agreement for these services, but Covenant never charged Jensen for the services.

105.   Covenant offered these free services to Jensen to reward and induce referrals.

### Thomas Damuth, M.D.

106.   Defendant also provided free services to Thomas Damuth, a pulmonologist and critical care specialist in private practice.

107.   Covenant offered these free services to reward Damuth when he agreed to switch his referrals to covenant from St. Mary's Hospital, a local competitor.

108.   As a reward, Covenant embedded Gerald Pruitt, D.O., a Covenant-employed pulmonologist, in Damuth's office to assist with his practice with tasks such as on-call services.

109.   Defendant did not charge Damuth for the assistance Pruitt provided to the practice.

110.   Although it is not uncommon for embedded physician to share on-call duties, under the circumstances, the services provided by Pruitt were consistent with the other remuneration and inducements that Covenant offered physicians to secure referrals.

111.   In this case, Covenant offered Pruitt's assistance simply as a reward for Damuth switching his referrals to Covenant.

### Ronald Bays, M.D.

112.   Defendant also arranged for Brian Beeman, M.D., a Covenant-employed physician, to staff Ronald Bays' private vascular surgery practice, MidMichigan Vascular Surgery Practice.

113.   Namely, Beeman assisted with Bays on-call services.

114.   Covenant compensates Beeman for these services and does not charge Bays; Covenant offers Beeman's services as remuneration for Bays referring a significant volume of patients to Covenant.

### Ron Barry, M.D.

115.   Similarly, Covenant embedded Anthony Zacharek, M.D., a Covenant-employed physician, in Ron Barry's private plastic surgery practice.

116.   Zacharek assisted in Barry's practice and provided on-call coverage for Barry.

117.   Defendant did not charge Barry for these services, instead offering the free services as a remuneration for Barry referring patients to Covenant.

### Mark Adams, M.D.

118.   Defendant also supplied Covenant employees to staff the private neurosurgery practice of Mark Adam's, M.D.; although Covenant charged Adams for the staffs' services, Covenant did not charge Adams for the management services it provided.

119.   Adams formerly served as a Covenant-employed physician.

120.   During his employment, Covenant grossly overcompensated Adams.

121.   In 2007, Covenant paid Adams $3,064,434; in 2008, Covenant paid Adams $2,581,404; and in 2009, Covenant paid $2,637,738.

122.   In 2009, Covenant designated $1.17 million of Adams' salary as "bonuses and incentive compensation" and $500,000 as "other reportable compensation."

123.   This substantial overcompensation rewarded Adams for referring a high volume of patients to Covenant.

124.   In 2010, Claro Group, a third-party auditor, flagged Adams' overcompensation as excessive and expressed concerns about his quality of care.

125.   As a result, Covenant leadership "spun out" Adams in private practice.

126.   Defendant maintained a close relationship with Adams after he went into private practice.

127.   In fact, Defendant supplied Covenant employees to staff Adams' practice; Adams was the only person in the practice not employed by Covenant.

128.   Dave Nall explained to Relator that Covenant did not charge Adams for the services Covenant provided, managing the Covenant employees who staffed Adams' practice.

129. Nall elaborated that this set up allowed Adams to save more money with his pension specifically.

130. In fact, Nall reported to Relator that Adams would not remain loyal to Covenant if Covenant did not provide such remuneration.

131. Covenant continued to support Adam's private practice, despite complaints that Adams engaged in unsafe practices that diminished his ability to safely care for patients.

132. Specifically, staff complained that Adams did not see all of this neurosurgery patients and that notes appeared in Adams' charts over weekends when Adams did not work or see any patients.

133. Covenant turned a blind-eye to such concerns, so that it could maintain Adams as a lucrative referral source.

134. In this way, Adams solicited and accepted remuneration provided by Covenant.

**C.** **Defendant provides a myriad of perks as a form of remuneration and inducement to referring physicians.**

135. Defendant seeks out ways to provide benefits that allow physicians to collect larger net incomes, which exceed fair market value.

136. Relator follows a pattern of practice, offering perks as a way to reward and induce referrals to Covenant.

137.  Relator fully comprehended Covenant's referrals-at-any-cost philosophy when Dave Nall emailed the personal account of Robert Grimshaw, M.D., stating that Covenant "generously values" referrals.

138.  Nall sent this email while Covenant actively recruited Grimshaw; Covenant hoped that Grimshaw would join Covenant so that it could capture his referral traffic.

### Thomas Damuth, M.D.

139.  Covenant paid Thomas Damuth, M.D., $12,000-$14,000 per month to cover the overhead costs of hosting Covenant-employed physician, Gerald Pruitt.

140.  This payment ostensibly covered the overhead costs that Damuth incurred while Pruitt was embedded in Damuth's practice, such as the cost of using office space, exam rooms, support staff, and equipment.

141.  But the $12,000-$14,000 that Covenant paid grossly overcompensated Damuth for his overhead costs and was inconsistent with fair market value.

142.  The payments are inconsistent with fair market value, considering that Pruitt only worked a total of eight hours per week in the practice.

143.  Covenant overpaid Damuth's overhead costs as remuneration for Damuth agreeing to switch his referrals from St. Mary's Hospital to Covenant.

**Ronald Bays, M.D., and Ronald Barry, M.D.**

144. Covenant crafted a similar arrangement to overcompensate Ronald Bays, M.D., and Ronald Barry, M.D., for hosting Covenant-employed physicians in their private practice.

145. Covenant embedded Brian Beeman, M.D., a Covenant-employed physician, in Ronald Bays', M.D., private practice.

146. Although Beeman only worked minimal hours in Bays' practice, Covenant paid Bays approximately $14,000 per month for Beeman to use the office.

147. Such payments exceeded the fair market value of the overhead costs incurred when Beeman used the office space, equipment, support staff, etc.

148. This overcompensation allowed Defendant to reward Bays for referring patients to Covenant.

149. Similarly, Covenant Covenant embedded Covenant-employed physician, Anthony Zacharek, M.D., in the private practice of Ronald Barry.

150. Through a purchased service agreement, Defendant compensated Barry for Zacharek's overhead costs beyond fair market value.

151. But Covenant's payments exceeded the variable costs for Zacharek's actual use of the facility and support staff.

152. These excessive payments rewarded Barry for referring a high volume of patients to Covenant.

153. Covenant overcompensated Barry and Bays, even though it lost money of Zacharek's and Beeman's individual practices.

## Gratiot Family Practices

154. Defendant also pays Gratiot Family Practices in excess of fair market value to lease space in a building that Covenant built as a joint venture with the practice's physicians.

155. Initially Gratiot Family Practices was a private practice in Alma, MI, which routinely referred patients to MidMichigan Health, a Covenant competitor.

156. When Covenant acquired the practice, it entered into a joint venture with the practice's physicians—Vicki Chessin, M.D., Christopher Murray, M.D., and Gregg Stefanek, M.D.; Covenant also committed to build the practice a new, state-of-the-art facility.

157. When the facility was completed, Covenant leased the facility from the practice's physicians to house Gratiot Family Practices, which Covenant had since acquired.

158. Covenant paid a substantially higher rate to use the new facility relative to the practice's former building; moreover, Covenant paid excessively to lease the space, even though it already paid to build the facility in the first place.

159. With this scheme, Covenant provided a steady source of overcompensation to the practice's physicians.

160.   Covenant intended this overcompensation to reward the physicians for referring patients to Covenant for high-level procedures.

161.   Covenant even racked Gratiot Family Practice's inpatient referrals after the acquisition to ensure that the physicians referred patients to Covenant as they had agreed.

### Guaranteed Minimum Salary Divorced from Performance

162.   Covenant created contracts for all Covenant-employed physicians, which set a minimum floor for compensation.

163.   Under such contracts, physicians cannot receive less than the specified floor, even if they drastically underperform.

164.   For example, a physician's contract might guarantee her a compensation no less than the 50th percentile; even if that physician actually performed at the 25th percentile, Covenant guarantees that it will pay her at least at the 50th.

165.   Dan George created such contracts for Covenant cardiologists.

166.   The cardiologists substantially under-performed, resulting in financial losses for Covenant, particularly in professional fees.

167.   Covenant kept such contracts in place because it recovered its losses as the cardiologists internally referred a high volume of patients to Covenant.

168. Covenant compensates these physicians relative to their actual productivity; Covenant ignores fair market value so that it can induce and reward referrals.

169. Relators noted this problem in several different departments, and she shared her concerns with Covenant Executives.

170. Southwind, an independent consultant, also documented this problem, reporting that under a Relative Value Unit ("RVU") model, Covenant drastically overcompensated its physicians relative to their productivity.

171. Southwind called this practice "unsustainable," and explained that the compensation had "no clear ties to economics" and was "higher than necessary."

172. Covenant noted that while Covenant paid physicians at the 75th percentile, they in fact performed at the 50th percentile.

173. In this way, Covenant's contracts for its physicians do not provide fair market value compensation based on physicians' actual performance.

174. Instead, Covenant offers salary protection, through contractual salary floors, in order to reward and induce referrals.

**Discounted Malpractice Coverage**

175. Covenant provides discounted malpractice coverage, which is below fair market value, to both independent and Covenant-employed physicians.

176. This provides a substantial benefit to the physicians, who enjoy reduced expenses and increased net income.

177. Southwind, an independent consultant, documented Covenant's extraordinarily discounted malpractice insurance rates.

178. Generally, Covenant made efforts to keep the discounted coverage quiet, but when Relator discovered the discount, she asked Mark Gronda about it.

179. He seemed started and replied, "How do you know about that? No one is supposed to know about that!"

### Anthony de Bari, M.D.

180. Anthony de Bari, M.D. was a formerly independent orthopedic surgeon, who loyally referred many patients to Covenant.

181. Covenant acquired de Bari's practice as a defensive strategy to thwart competitors.

182. After acquiring the practice Covenant immediately paid de Bari a higher salary, using a higher RVU multiplier.

183. Covenant inappropriately used a higher RVU multiplier, which exceeded de Bari's historical performance.

184. Additionally, Covenant purchased all practice assets, even those that were not medically necessary, conveying another perk to de Bari.

185. Covenant offered such perks as remuneration for de Bari's referrals, even though it suffered losses on de Bari's practice.

### Brian de Beaubien, M.D.

186. Brian de Beaubien, M.D., practiced as an independent orthopedic surgeon, exclusively referring patients to St. Mary's Hospital, a Covenant competitor.

187. Covenant acquired de Beaubien's practice, convincing de Beaubien to switch his referrals to Covenant by offering him a higher salary.

188. As part of the acquisition, Covenant purchased all practice assets, even those that were not medically necessary.

189. After acquiring de Beaubien, Covenant compensated him using a higher RVU multiplier that exceeded de Beaubien's historical performance.

190. A report from an independent consultant, Southwind, demonstrated that Covenant overcompensated de Beaubien based on his prior activity and that as a result Covenant suffered losses in the practice.

191. Still, Covenant offered de Beaubien perks in order secure his loyalty and to induce referrals.

### Andrew LaFleur, M.D.

192. Andrew LaFleur, M.D. is a family medicine doctor, practicing in Saginaw, MI.

193. Relator oversaw his contract with Covenant and observed that Covenant overcompensated LaFleur.

194. Covenant disregarded the terms of LaFleur's contract, which specified that his salary would be capped at 110% of the 90th percentile set by the Medical Group Management Association; nonetheless, Covenant ignored this excessively compensate LaFleur.

195. Relator attempted to enforce the terms of LaFleur's contract; LaFleur was furious, even threatening to leave Covenant to start a private practice.

196. Relator deduced that Covenant disregarded the contract in order to overcompensate LaFleur as remuneration for referring patients to Covenant.

### Cheryl Canfield, D.O., and Edward Canfield, D.O.

197. Cheryl Canfield and Edward Canfield are primary care physicians based in Sebewaing, MI; Covenant strategically acquired the practice.

198. As part of the acquisition, John Kosanovich put contracts in place, which specified a minimum number of clinical hours per week.

199. Covenant executives regularly did not enforce this term, allowing the Canfields to work fewer clinical hours while receiving the same pay.

200. This essentially provided the Canfield's paid time off.

201. When Relator discovered this problems, she sought to enforce the contract even though the Canfields were furious.

202.  Relator deduced that Covenant had agreed to not enforce the contract as remuneration for the Canfield's switching their referrals to Covenant from McClaren Bay, a Covenant competitor.

### Thomas Damuth, M.D.

203.  As described *supra*, Covenant gave Thomas Damuth, M.D., ample remuneration when he agreed to refer his patients to Covenant instead of St. Mary's Hospital, a local competitor.

204.  As part of this remuneration, Covenant awarded Damuth's wife, Culli Damuth, a position on Covenant's Board of Directors, as soon as Damuth severed his ties with St. Mary's.

### Free Services for Physicians through Unallocated Expenses

205.  Covenant did not allocate all expenses to physicians, thereby allowing the physicians to reduce their costs and increase their net revenue.

206.  For example, during Relator's tenure, Covenant adopted EMR technology, using Epic software.

207.  Covenant incurred substantial costs through licensing fees, etc.

208.  Covenant provided EMR technology but never allocated the costs associated with the software to the physicians.

209.  Similarly, Covenant did not fully allocate the cost of moving expenses to new physicians.

210. When new physicians relocated to work at Covenant, they used services from Stevens Van Lines.

211. Covenant did not fully allocate the expenses from Stevens Van Lines to the newly Covenant-employed physicians as taxable income.

212. Covenant paid approximately $400,000 to Stevens Van Lines. The funding came from Covenant's recruitment budget.

213. By not fully allocating expenses for EMR and moving costs, Covenant reduced physicians' costs and increased their net revenue in order to induce and reward referrals.

### Eyad Wohaibi, M.D.

214. Covenant fostered a close relationship with MidMichigan Surgical Specialists in order to induce and reward referrals.

215. At one point, Covenant promised the practice that it would fund the recruitment of Eyad Wohaibi, M.D.; Covenant partially made this agreement in the hopes the Wohaibi would help found a bariatric program.

216. After the practice had already recruited Wohaibi, Covenant awarded him significant funding, under the guise of recruitment funding.

217. Although Covenant arguably had mixed motives for providing recruitment funding, it offered the funding—at least in part—as inducement and remuneration for referrals.

D.     **Covenant uses Medicare and Medicaid funds, generated by a scheme involving HealthPlus, to compensate physicians above fair market value as remuneration and inducement for referrals.**

218.   Covenant engages in a scheme involving its Physicians' Organization ("PO"), Covenant Healthcare Partners ("PHO") (a joint venture between the PO and Covenant Medical Center, and HealthPlus, an insurance provider.

219.   This scheme allows Covenant to create an additional source of revenue from insurance claims, including Medicare and Medicaid claim; Covenant then uses this scheme to offer remuneration and inducements to physicians through bonuses and larger professional fees.

220.   Such bonuses allow Covenant to compensate referring physicians at a rate above fair market value.

221.   HealthPlus is a not-for-profit health organization, offering healthcare coverage for employers; it provides some coverage through Medicare and Medicaid.

222.   HealthPlus offers insurance to employers, who in turn offer HealthPlus insurance to their employees.

223.   Subsequently, HealthPlus contracts with healthcare service providers, including PHOs, hospitals, and physicians.

224.   In this case, HealthPlus contract with a Covenant affiliated service provider, a joint venture that included Covenant's PHO and PO; this joint venture

encompassed both Covenant-employed physicians and independent physicians.

225.   When a Healthplus patient signed up with a doctor, who participated in the joint venture, HealthPlus added that patient to the doctor's panel.

226.   HealthPlus then paid a flat fee to the PHO-PO joint venture; that flat fee was intended to cover the expenses for the patient's care.

227.   The joint venture then took those flat fees to create a pool of funding.

228.   When a HealthPlus patient required care or services, the money covering those expenses came out of this pool of funding.

229.   Conversely, when physicians did not provide care or services to a HealthPlus patient, money remained in the pool.

230.   At the end of the fiscal year, Covenant, through Covenant executive Michael Slavin, took whatever money was left in the pool and divided it out as bonuses for physicians.

231.   Relator believes that Covenant used the bonuses as remuneration for physicians that referred a high volume of patients to Covenant.

232.   Several consultants noted to Relator that these bonuses were unusually high.

233.   Some physicians received six-figure bonuses, which made their net income far exceed fair market value.

234.   Covenant executives actively fostered the HealthPlus scheme.

235. Michael Slavin controlled the money in the HealthPlus pool, using the funding left over at the end of the year to divvy out bonuses to physicians.

236. Another Covenant executive, Mark Gronda, reported that Covenant reduced its facility fees for HealthPlus patients.

237. Covenant discounted the inpatient facility fees so that it could offer more lucrative professional fees to HealthPlus-participating physicians.

238. Although this reduced Covenant's profits from inpatient facility fees, the discount allowed physicians to gain higher profits.

239. Covenant intended these inflated professional fees as an inducement for referrals.

E.   **Defendant knowingly submits false claims to Medicare and Medicaid, which do not comply with CMS regulations.**

**Jacob Ninan, M.D.**

240. Jacob Ninan, M.D., who passed away in 2015, was an oncologist with offices in Saginaw, Bad Axe, and Sebewaing, MI.

241. Covenant acquired Ninan's practice in order to grow their oncology referrals.

242. Ninan normally practiced in his clinics around Saginaw, MI, but twice a month, he visited his clinic in Bad Axe in the thumb of Michigan.

243. When Ninan visited the Bad Axe clinic, his nurses administered chemotherapy treatments to Ninan's patients.

244. Covenant then billed Medicare and Medicaid for these treatments, even though a physician did not supervise the treatments.

245. In 2011, St. Mary's, a Covenant competitor, settled a case for nearly $3.5 million, after it came to light that it billed for oncology treatments that were administered by nurses without direct supervision from a physician.

246. Following the settlement, Covenant quickly realized that it too had committed comparable violations, involving Ninan's oncology practice.

247. Covenant subsequently had a meeting to address the problem, but adopted a loose interpretation of "direct supervision," wherein a physician simply needed to be available to nurses administering treatments but did not need to actually supervise treatments.

248. Subsequently, when Ninan visited the Bad Axe clinic, another doctor, who worked in Ninan's building, was on-call for emergencies.

249. Against Relators protestations, Covenant insisted that it would not self-disclose the CMS violations, which had occurred for approximately two years.

### MedExpress Urgent Care Clinics

250. Covenant own and operate five MedExpress Urgent Care Clinics, which midlevels primarily staffed.

251. At any given time, only one or two physicians were available to the five clinics; therefore, midlevels routinely provided care and worked independent of any physician supervision.

252. Southwind, an external consultant, observed that the MedExpress Clinics were "profitable" due to "MLP's [midlevels'] contributing productivity per MD [physician]."

253. In July 2012, Covenant transferred supervision of MedExpress Urgent Care clinics to Relator; she soon discovered that these clinics did not have collaborative agreements in place.

254. CMS guidelines require such agreements to ensure that physicians directly supervise midlevel care.

255. Covenant did not comply with this requirement, but nonetheless billed Medicare and Medicaid for unsupervised services.

256. As soon as she discovered the problem, Relator immediately had collaborative agreements put in place; but, Covenant insisted it would not self-report the violations.

## Coding Errors

257. Covenant permitted Gratiot Family Practices to routinely upcode in Medicare and Medicaid claims.

258. This increased the value of Covenant's claims.

259. Southwind, an independent consultant, flagged coding as a problem within Covenant.

### Andrew LaFleur, M.D.

260. Andrew LaFleur, M.D., is a Covenant-employed family medicine doctor.

261. Covenant employed nurse practitioner, Patti Davis, to assist with LaFleur's practice.

262. In defiance of licensing regulations, Covenant allowed Davis to host her own panel of patients, treating patients and developing her own plans of care without routine supervision from a physician.

263. Covenant certified Medicare and Medicaid claims for services Davis provided without supervision, even though such claims violated CMS guidelines.

264. Covenant then allocated the money from these fraudulent claims to LaFleur, bolstering his compensation.

265. Covenant engaged in similar schemes in Saginaw Township Family Practice and Frankenmuth Family Practice.

### Seventy-Two Hour Rule Violations

266. Under CMS's Seventy-Two Hour Rule, providers must bundle inpatient services with all diagnostic and outpatient services provided within three calendar days prior to inpatient admission.

267. Covenant routinely violated this rule, using Epic EMR software to bill separately for services rendered within the seventy-two-hour window.

268. Such services should have properly been billed together.

## COUNT ONE
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

269. Covenant alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

270. By virtue of the acts described in the preceding paragraphs, Covenant knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

271. To maintain its Medicare billing privileges, Covenant must be in compliance with Medicare billing provisions set forth in 42 C.F.R. § 424.535.

272. Covenant engaged in a myriad of schemes, such as upcoding and unsupervised midlevel treatments, to increase the amount of its Medicare reimbursements.

273. Covenant's FCA violations lead to violations of Medicare billing requirements.

274. Covenant knowingly presented and continues to be presented falsified billing information for services that did not comply with CMS and presented claims that were improperly coded.

275.   Relator has knowledge of fraudulent claims.

276.   The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations. Covenant knowingly made false claims in the form of reimbursement bills to officials of the United States for the purposes of obtaining compensation.

277.   Covenant's management is aware of its fraudulent billing practices and has not taken any steps to properly bill for services because doing so would substantially reduce its reimbursement from the Government and therefore reduce its profits.

## COUNT TWO
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

278.   Relator alleges and incorporated by reference, the allegations made in all of the preceding paragraphs of this Complaint.

279.   By virtue of the acts described in the preceding paragraphs, Covenant knowingly made and used, and continues to make and use, false records to submit to Medicare for reimbursements.

280.   Covenant knowingly billed Medicare using improper coding and/or billed Medicare for services that did not comply with CMS guidelines. Moreover, Covenant billed Medicare for services that were the product of illegally

induced referrals. Such induced referrals, which are themselves violations of the Stark Act and AKS, further qualify as false claims that are subject to FCA liability.

281.  Relator has first-hand knowledge of these violations.

282.  The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations. Covenant knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

283.  Covenant is aware of its fraudulent practices, yet continues the same fraudulent practices because proper billing would substantially reduce its reimbursement from the Government and its profits.

284.  By submitting false claims and statements, Covenant violated the Requirements for Establishing and Maintaining Medicare Billing Privileges, set forth in 42 C.F.R.

§ 424.500.

## COUNT THREE
### Violations of the False Claims Act
### 31 U.S.C. §3729(a)(1)(G)

285.  Relator alleges and incorporated by reference the allegations made in all of the pending paragraphs of this Complaint.

286. By virtue of the acts described in the preceding paragraphs, Covenant knowingly made and used, and continues to make and use, false records and statements to transmit money from the Government.

287. As a result of Covenant's false statements the Government reimbursed Covenant, through Medicare and Medicaid, in excess of the amount Covenant should have received.

288. Further, Covenant knowingly concealed and knowingly avoided an obligation to transmit money to the Government. The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations.

289. Covenant was aware of the false claims submitted to the government and its obligations to return the excessive funds to the Government. However, it never did so.

## COUNT FOUR
### Violations of the Anti-Kickback Statute
### 42 U.S.C. §1320a-7(b)

290. Relator alleges incorporated by reference the allegations made in all of the pending paragraphs of this Complaint.

291. By virtue of the acts described in the preceding paragraphs, Covenant knowingly and willfully offered to pay remuneration to physicians in order to induce physicians to refer patients to Covenant.

292.   Covenant then billed Medicare and Medicaid for the referred services, thereby submitting false claims in order to recover money from reimbursements.

293.   While Covenant may have had some legitimate purpose for offering benefits to physicians, it, least partially, intended such benefits to be remuneration for referrals.

294.   As a result, the United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations.

295.   Covenant was aware regulations prohibiting remuneration and inducements for referrals, but still regularly offered—and continues to offer—inducements for referrals. Covenant has not ceased this practice despite knowing of the violations.

296.   No relevant safe harbor protected Covenant's activity.

## COUNT FIVE
### Violations of the Anti-Kickback Statute
### 42 U.S.C. §1320a-7(b)(1)

297.   Relator alleges and incorporated by reference the allegations made in all of the pending paragraphs of this Complaint.

298.   By virtue of the acts described in the preceding paragraphs, Mark Adams, M.D., knowingly solicited and accepted illicit remuneration from Covenant

in return for referring patients to Covenant for services that Covenant then

billed Medicare and Medicaid.

299. While Adams may have had some legitimate purpose for accepting benefits

from Covenant, he, least partially, accepted said benefits as remuneration for

referrals.

300. No relevant safe harbor protected Adams' activity as all the relevant

inducements exceeded fair market value.

301. Consequently, the United States has been damaged by all of the

aforementioned violations.

**COUNT SIX**
**Violations of the Stark Act**
**42 U.S.C. §1395nn**

302. Relator alleges and incorporated by reference the allegations made in all of

the pending paragraphs of this Complaint.

303. By virtue of the acts described in the preceding paragraphs, Covenant caused

Medicare and Medicaid claims to be presented for designated health services

referred by a physician that had a financial relationship with Covenant.

304. Likewise, by virtue of the acts described in the preceding paragraphs, Mark

Adams, M.D., caused Medicare and Medicaid claims to be presented for

designated health services that Adams referred to Covenant despite having a

financial relationship with Covenant.

305.   As a result of Covenant's and Adams' actions, the United States was harmed

by the aforementioned violations.

306.   Covenant knew of both the relevant violations and of the applicable

regulations; still it failed to half the prohibited activity. Likewise, Adams

knew of the violations, but did not attempt to stop them.

307.   No exception protects the defendants from liability.

## COUNT SEVEN
### Violations of the Michigan Medicaid False Claim Act
### MCL 400.604-400.607

308.   Relator alleges and incorporated by reference the allegations made in all of

the pending paragraphs of this Complaint.

309.   By virtue of the acts described in the preceding paragraphs, Covenant

knowingly made and used, and continues to make and use, false claims to

state Medicaid.

310.   Specifically, Covenant offered bribes and kickbacks for referrals. It then

submitted claims to state Medicaid for these referred services. Likewise,

Mark Adams, M.D., accepted bribes in exchange for referring patients to

Covenant.

311.   Covenant received excessive funds from false claims, Covenant avoided its

obligation to transmit money to the state government.

312.   Covenant was aware of the false claims submitted to the government and its

obligations to return the excessive funds to the Government. However, it

never did so.

313.   The state of Michigan was damaged by the defendants' actions.

## **PRAYER FOR RELIEF**

314.   WHEREFORE, the United States is entitled to damages from Defendant in

accordance with the provisions of 31 U.S.C. §§ 3729-3730, and Relator

requests that judgment be entered against Defendants, ordering that:

a.      Defendant cease and desist from violating the Federal False Claims

Act, 31 U.S.C. §§ 3729 *et seq.*- 3730(h); the Stark Act, 42 U.S.C § 1395nn,

*et. seq.*; the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and the

Michigan Medicaid False Claim Act, MCL 400.601, *et seq.*

b.      Defendant pay an amount equal to three times the amount of damages

the United States has sustained because of Defendant's actions;

c.      Defendant pay the maximum civil penalties allowed to be imposed for

each false or fraudulent claim presented to the United States;

d.      Plaintiff/Relator be awarded the maximum amount allowed pursuant

to the FCA, AKS, Stark Act, and MFCA;

e.      Plaintiff/Relator be awarded all costs of this action, including

attorneys' fees, expenses, and costs;

f.      The United States and Plaintiff/Relator be granted all such other relief

as the Court deems just and proper.


Dated: July 25, 2016                    Respectfully submitted,

                                        HARON LAW GROUP

                          By:    /s/ David L. Haron
                                 David L. Haron, Esq.
                                 30300 Northwestern Highway, Suite 115
                                 Farmington Hills, MI 48334
                                 (248) 762-7009
                                 dharon@haronlawgroup.com

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to

the local rules of this Court, the Relator demands a jury trial as to all issues so

triable.


Dated: July 25, 2016                    Respectfully submitted,

                                        HARON LAW GROUP


                          By:    /s/ David L. Haron_____
                                 David L. Haron, Esq.